## SCARBOROUGH v. BASKIN.

1. EVIDENCE—EXPERT—TESTAMENTARY CAPACITY.—Where a witness states that he knew a testator over thirty years, talked with him repeatedly, had business with him, visited his home often, &c., he has stated facts upon which he can testify as to the mental capacity of such testator.

2. IBID.—TESTAMENTARY CAPACITY.—Proof that a testator jumped from one subject to another; often went to sleep in the rain or beside a stump; put harness on his horse improperly; went fishing and hunting without results; could not at times count money or weigh articles correctly; read with lamp on his breast; whipped his son in bed; rang bell at night; called his wife crazy, &c., is not sufficient to show testamentary incapacity.

3. IBID.—IBID.—ILL FEELING—BURDEN OF PROOF.—It is incumbent on contestant to show that ill feeling which he claims is basis of his exclusion from benefit of will was groundless, so far as testator was concerned.

Before DANTZLER, J., Sumter, May, 1902.    Affirmed.

Proceeding to prove will in solemn form by Orlando C. Scarborough against Fannie A. Baskin *et al.*    From Circuit decree, defendants appeal.

*Messrs. A. B. Stuckey, Cooper & Fraser* and *B. Frank Kelley,* for appellants, cite: *A non-expert witness cannot give an opinion without stating facts:* 1 McM., 56; 38 S. C., 199; 1 Whar. & Stille Med. Jur., secs. 380, 378, 385, 454. *As to testamentary capacity:* 4 McC., 193; 1 Bail., 92; 2 Mill, 232; 11 Ency., 1 ed., 151; 7 Rich. L., 480; 25 Ency., 1 ed., 983, 984; 63 Am. St. R., 94; 201 Pa. St., 490; 51 At. R., 336.   *As to burden of proof as to ill feeling:* 25 Ency., 979.

*Messrs. Purdy & Reynolds* and *Haynsworth & Haynsworth,* contra, cite: *Sanity is presumed:* 3 Hill, 68.   *As to testamentary capacity:* 1 Bail., 92; McC., 183; 35 N. Y., 70; 21 Vt., 168; 115 Ill., 623; 48 Wis., 294; 101 Pa., 495. *Burden to show insanity is on contestant:* 7 Pick., 94; 3 Hill, 68.

April 7, 1903.    The opinion of the Court was delivered by

MR. CHIEF JUSTICE POPE.    The contest here is over the testamentary capacity of Thomas Baskin, deceased.    Testator's will was executed 20th February, 1899.    His death occurred in July, 1900.    By the terms of the will, the testator gave his property to Orlando C. Scarborough and Dr. R. E. Dennis, "in trust to collect and hold the rents, income, issues and profits of the same annually and after paying the taxes thereon and any necessary repairs thereto, then to pay

over, annually unto my wife, Fannie S. Baskin, one-half of the net residue thereof, for and during her natural life or widowhood and no longer, and that they then do apply the other half thereof to the education, maintenance and support of my son, John S. B. Baskin. Second. Immediately upon the death or remarriage of my said wife, I give, devise and bequeath my entire estate to my said son, John S. B. Baskin, for and during the term of his natural life and no longer, and upon his death leaving issue, then I give and devise the same to such issue in the proportions they would take under the statutes of said State for the distribution of intestate's estates. But in the event that my said son should die leaving no issue alive, then I direct that my said estate be equally divided amongst the children of my friends, Dr. R. E. Dennis and O. C. Scarborough, *per stripes* and not *per capita*."

The contest over the testamentary capacity of Thomas B. Baskin, deceased, came on to be heard before Thomas V. Walsh, Esq., as probate judge of Sumter County. The grand-children of said Thomas Baskin, deceased, were the only contestants. Much testimony was taken by each side to the controversy. The judge of probate by his decree sustained the will. An appeal was taken to the Circuit Court, which came on to be heard by his Honor, Charles G. Dantzler, as presiding Judge. He also sustained the will. His decree was an able one. Its text was as follows:

"This case came before me, during the session of the Court of Common Pleas for Sumter County, on appeal from the decree of the probate judge of that county, pronouncing in favor of the validity of the will of Thomas Baskin, deceased. All issues were submitted to me by counsel in open Court, a trial of questions of fact by a jury having been waived. The following are the grounds of appeal: '1. Because his honor, the judge of probate, erred in allowing the witnesses, W. K. Crosswell, L. M. Crosswell, Joseph E. Wilson and J. F. Woodward, over respondents' objection, to give their opinion as to the mental capacity of the said Thomas Baskin, without showing that they were experts or requiring them to

state the specific facts upon which said opinions were based. 2. Because his honor, the judge of probate, erred in holding that the said proposed will was valid, and that at the time of making the same the said Thomas Baskin was of sound and disposing mind, memory and understanding; whereas, it is respectfully submitted that the preponderance of the evidence showed that the said Thomas Baskin had been, and was at the time of the making of said will, of unsound mind, and that said will was the creation of the disorder with which his mind was affected.'

"I heard counsel as fully as they desired to be heard, both orally and on written arguments submitted to me. Their arguments were able and well presented. Counsel for appellants in their arguments before me stated that they did not contend that Thomas Baskin, the alleged testator, was insane, generally; but argued that he was partially insane; that such partial insanity was exhibited by his dislike to his grand-children, the appellants herein; that such dislike was an insane delusion, and that laboring under such insane delusion, he disinherited them; that the will was the direct offspring of such insane delusion and should, therefore, be declared void. Counsel for the will contended that, 'at most, nothing beyond some eccentricities have been shown, and that in no case have these eccentricities amounted to a deprivation of the reason or understanding of the testator.' That in the case at bar, the contestants have not only conceded that there was no general insanity, but have failed to show want of capacitiy of the said Thomas Baskin at the time of the execution of the will. And it is urged, therefore, that the decree of the judge of probate pronouncing in favor of the validity of the will should be affirmed. In support of their contention, contestants rely upon the will itself, and upon the testimony adduced by them of the following named witnesses: Messrs. Hartwell Crosswell, T. M. Muldrow, E. C. McCoy, J. O. Durant and Mrs. F. S. Baskin. The portion of that testimony relating to the conduct and declarations of the testator, from which, in connection with

36—65

the will, contestants conclude that he was incapable of dis-
posing of his property, is, substantially and briefly, as fol-
lows: That in the latter years of his life, Thomas Baskin
was a very peculiar man; so peculiar that, in the opinion of
some of the witnesses for contestants, he was 'crazy,' and
incapable of disposing of his property; that his mind 'would
come and go;' that sometimes he would speak kindly of his
grand-children, the appellants herein, and that, at other
times, when in his 'spells' or 'tantrums,' he would not.   In-
stances of his peculiarities are stated to have been that, while
walking along and in conversation, he 'would jump up and
start and bat his fists' without any apparent reason, and that
he 'would be walking slowly and would step up for about
eight or ten steps and bat his fists, as if going to come in
contact with something;' that while in conversation he would
go to sleep by a stump and 'was a great man to sit down by
a stump and go to sleep,' and would 'sleep in the rain;' that
he would put the collar on his horse 'backwards' and insist
that it was 'all right,' and would try to put the 'crupper' of
the harness over the horse's head; that he would ring his
family bell at night; that, before the death of his second wife,
during her confinement in the asylum in Columbia, S. C.
(one of the witnesses, Mr. Hartwell Crosswell, stated that it
was *after* her death), he went to Columbia and returned
with 'a watch and a plain gold ring,' and asked if they would
not 'get him another wife;' that he would sit down on his
piazza 'and commence talking * * * and in a few minutes he
would jump up and walk up and down the floor talking to
himself,' and would talk to himself when driving in 'the
buggy; that when told something, in a few minutes he would
ask * * * over again;' that he would change unnaturally
from one subject to another in conversation; that he would
'start talking, and start cursing and abusing the negroes or
say something about his wife, and then he would say some-
thing about going fishing, and when he would get in that
mind nothing would stop him, he would go.' That he would
change his purpose suddenly; that he would charge his wife

(now his widow) with being 'crazy,' and would send for his neighbors to come over because he considered her 'crazy.' That he expressed himself, at times, as being very fond of his grand-children, and at other times he said he disliked them, 'Ed. especially;' that he would be found sometimes 'in a glee' and sometimes 'in a stupor or study, as if he was worried,' and that there would be a 'difference in him at times;' that, during his latter days, he was not the same kind of a man as he had been in previous years and did not behave the same way; that in 1898, up to February, 1899, he would be 'always wanting to go talk politics or fishing and all of them at the same time;' that not many people would go with him fishing, 'he was so pickayunish.' That on one occasion he was seen to sell a negro boy a piece of meat at one-half of its weight, and when told of his mistake, he said, 'Well, let him take it, I want to fatten him;' that he could not count money correctly at times. That soon after his third marriage, he expressed a desire to his wife to have a chicken dinner, and told her that there would be about '25 or 30' people to dine, and that, after the dinner had been prepared for that number, it was ascertained that '75' had been invited. That when taking a drive with his wife, on one occasion, she saw him 'roll his eyes back,' and that she, being worried about his conduct, 'cried a good deal,' and that when he found her crying, he 'scolded' her and said that she was 'crazy.' That one night he became raving about the absence of his son, John, and 'got his gun and said he was going to kill him, and that after John returned,' he told John not to go near Mrs. Baskin, that she was 'crazy;' that he would speak of his wife as being 'crazy,' and told some negroes, on one occasion, 'if she runs this way catch her, she is crazy;' that 'he would take a notion' that his wife was 'crazy' and would follow her and say, 'oh, my poor crazy wife;' that on another occasion, he asked his wife to make him a promise, and upon being assured that she would promise anything reasonable, said to her, 'stay in the house and don't walk around or go anywhere, or people will find out

that you are crazy, and if you go out walking you might die, and some one might think I poisoned you.' That his son, John, on leaving home in a buggy with Mrs. Baskin for 'Mr. McCoy's,' on one occasion, was told by Mr. Baskin, 'don't let your ma get out of the buggy, she might go away off to Ingrams and not come back;' that on another occasion he sent John to look 'in the well' for Mrs. Baskin. That one night he waked up between 11 and 12 o'clock, and said to his wife, 'Ma, I am going to whip John * * * and he took a lamp and went down the back steps, and he went out and cut two or three switches and came back and he looked strange,' and said, 'I am going to whip him, and if you say any more I will give him more.' He tied John with a twine string while he was asleep and commenced whipping him, and he said to Mrs. Baskin: 'When I whip him as much as you think he needs, you come and beg for him.' He did not whip him severely, and said he whipped him because 'he had nearly drowned two of his mules;' that he was kind to his wife 'except when he had those spells;' that at times he was very fond of his grand-children and then again he was not. That 'he would roll up his pants and put under his pillow, with ten or fifteen cents in his pockets, and he would say some one would rob him, and sometimes there would be fifty dollars or a check for that amount in his pockets, and he would hang them in the piazza.' That he would 'take a notion' that his wife was crazy and would ring the bell, and the hands would come up and he would tell them that his wife was 'crazy;' he would say, 'she has got one of her spells,' and then he would say, 'you are crazy, when you go anywhere don't talk, for they will find out you are crazy.' That he would lie with a lamp on his chest and read that way. Such other of the testimony of the contestants as I may consider relevant and material to the issue will be hereinafter referred to and commented upon.

"The witnesses adduced on behalf of the executor, Mr. Orlando C. Scarborough, and for the will were: Maj. Marion Moise, Col. R. D. Lee, Mr. I. C. Strauss (the wit-

nesses to the execution of the will), Dr. R. E. Dennis and Messrs. W. K. Crosswell, L. M. Crosswell, Scarborough Barnes, Samuel Bradley, Joseph E. Wilson, T. E. Davis, J. T. Muldrow and J. F. Woodward.

"One of the grounds of appeal of the contestants is that 'the judge of probate erred in allowing the witnesses, W. K. Crosswell, L. M. Crosswell, Joseph E. Wilson and J. F. Woodward, over respondents' objection, to give their opinion as to the mental capacity of the said Thomas Baskin, without showing that they were experts or requiring them to state the specified facts upon which said opinions were based.' I cannot agree with counsel. I have examined the testimony of those witnesses carefully, and it seems to me they did base their opinions upon conversations and transactions had with Mr. Baskin; that they testified as to his mental capacity as it appeared to them from those conversations and transactions. The testimony of Maj. Marion Moise, one of the witnesses to the execution of the will, was to the effect that, at the time of the execution of the will, Mr. Thomas Baskin was, apparently, perfectly sound, physically and mentally, and that there was nothing in his conduct on that occasion, to indicate that he had not sufficient mental capacity to make a will; that for his age, Mr. Baskin was remarkably strong, physically and mentally; that on the morning the will was made, Mr. Baskin came into his office and discussed the subject at some length; 'that he had seen Mr. Baskin once or twice a year for a number of years, but not oftener than a few times each year.' That he would have discussions with him on different subjects. Col. R. D. Lee, another witness to the execution of the will, testified, substantially, that he had known Mr. Thomas Baskin well; that he had known him a great many years. That the will was prepared by the directions of Mr. Baskin 'in full;' 'that the matter was discussed for quite a long time,' and that Mr. Baskin gave him full instructions as to what disposition he desired made of his property and estate; that Mr. Baskin's instructions were 'full and clear,' and that he was 'absolutely competent in every

respect.' That after the execution of the will, Mr. Baskin said, 'What will your fee be?' To which he replied, 'About $15 for a simple will like that.' Then Mr. Baskin said, 'The one I had drawn here before I only paid $10 for,' to which Col. Lee replied, 'Very well, whatever is satisfactory to you.' That Mr. Baskin then said, 'I haven't the money with me to-day,' and he then told Mr. Baskin, 'it was a matter of no consequence,' that he would just charge him on our ledger accounts. Mr. Baskin then said, 'No, he preferred to give * * * a due bill;' whereupon a due bill was prepared, which was signed by Mr. Baskin, and at maturity paid. That he regarded Mr. Baskin, on the occasion of the execution of the will, and at all times, as a man of extraordinary mental and physical vigor; that he had never heard of any mental incapacity of Mr. Baskin except in connection with this case since this thing started. Mr. I. C. Strauss, the remaining witness to the execution of the will, said, among other things, in substance, that on the day of the execution of the will he regarded Mr. Baskin as sound as he was; that he knew him 'fairly well.' The testimony of the other witnesses will be hereinafter referred to.

"Considering the testimony of witnesses for appellants, Mr. Thomas Baskin was, undoubtedly, a very peculiar man, but there was nothing in his conduct, considering his age, to indicate that he had wholly lost his capacity to understand his business affairs. Certainly, at times, he would talk intelligently and act rationally. As most of the witnesses for the appellant say, his mind would come and go. I am satisfied, from testimony of witnesses for contestants, that Mr. Baskin was at times perfectly rational and fully capable, mentally, of understanding his business affairs. His sudden change of purpose; his sudden 'jumping' from one subject to another, in conversation; his going to sleep in the rain, by a stump; his failure to adjust the harness on his horse properly; his fishing and hunting proclivities, without accomplishing results; his failure to count money at times, and 'weigh meat correctly; his putting a lamp on his chest and reading by the

light of it; his whipping his son, John, at night; his ringing the bell at night for assistance, upon the supposition that his wife was 'crazy;' his persistent declarations to her and to others that she was 'crazy,' and the other instances of his peculiarities, as testified to by witnesses for contestants, were not such evidences of weakness of intellect, when considered in connection with his rational intervals as testified to by witnesses for contestants, as would, in my opinion, show that he had no such adequate conception of his business interests as would deprive him of knowing of what his property consisted and of intelligently directing its disposition. Mrs. Baskin herself stated that Mr. Baskin told her he would put her in the asylum, 'if he had the money, but he would have to mortgage his place to get the money;' and that 'for a great part of the time' he displayed 'as much sense as anybody.' He was an old man, with very few, if any, of his contemporaries left, and deprived, it seems, of the sympathy and consolation of many people when the infirmities of 'old age' were upon him; but the infirmities of 'old age' and the peculiarities incident to such a period of life, do not indicate such impairment of the mind as would prevent the exercise of a rational purpose. Mrs. Baskin, in her testimony, charged, substantially, that Mr. Baskin, in the making of his will, was subjected to the influence of Dr. Dennis unduly exerted. I find and hold that from the testimony, that charge is not sustained, and that Mr. Baskin made his will without the exercise of any 'undue influence.' The testimony of Mrs. Baskin, it seems, is a revelation of domestic infelicity resulting, for the most part, from intermarriage of a man of seventy-eight years of age with a woman of the age of thirty-five, after an engagement of three or four days. I shall not refer further to her testimony, except to such portion of it as relates to the attitude of Thomas Baskin to his grand-children, the appellants herein, because further reference is not necessary to a determination of the issues involved.

"What was that attitude? Certain witnesses stated that

sometimes he spoke kindly of them, and that, at other times, when in one of his 'tantrums,' 'spells' or 'crazy whim,' as denominated in the testimony of contestants, he would speak unkindly of them—of 'Ed. especially.' Mr. Baskin evidently considered that he had sufficient cause to warrant him in regarding appellants, his grand-children, with disfavor. Was that cause real or imaginary? In the cross-examination of Mrs. Baskin, she was asked: 'Is it not true that he took a violent dislike to Mrs. Sallie Baskin and towards her family?' She answered, 'That was before I knew him; I have heard him tell about the quarrel fifty times.' And the further question was propounded to her: 'Did he not tell you he did not intend to leave any of his property to members of that family?' And she replied, 'Yes, sir.' The only construction of which the above quoted language is susceptible is this: First. That Mr. Baskin entertained a violent dislike to 'Mrs. Sallie Baskin and towards her family' before his last marriage, that there had been a 'quarrel.' Second. That there had been no real reconciliation between the families; because Mr. Baskin told Mrs. Baskin, after their marriage, 'about a quarrel fifty times,' and declared that 'he did not intend to leave any of his property to that family.' On the same subject, Mr. T. M.. Muldrow's testimony was to the same effect. He was asked, 'Any unusual amount of trouble with anybody else?' He answered, 'About his grand-children; he fell out with them.' He was asked further, 'He didn't have any trouble in his immediate family?' In reply he said, 'Yes, sir; he and his wife didn't get on together. He didn't like Ed.; he got on well with all the rest; he always spoke well of Willie; he said he intended to make Willie his executor of his estate, but after the trouble he had with his family, he wouldn't do it.' And when asked, 'What trouble was it?' he said: 'Just a falling out with Mrs. Sallie Baskin's family.' Mr. E. C. McCoy testified, among other things, that 'Mr. Baskin had some falling out with Mrs. Sallie Baskin and became dissatisfied with his place, and he wanted to sell out and leave that country.' * * * From this

statement of Mr. C. E. McCoy, it is evident that Mr. Baskin became dissatisfied with his place and he wanted to sell out and leave that country because he 'had some falling out with Mrs. Sallie Baskin.'     Here is evidence of the settled purpose on the part of Mr. Baskin, a purpose cherished, doubtless, since the 'quarrel,' to leave none of his property to appellant; that he became aggrieved with Mrs. Sallie Baskin, for some cause, and his dislike was engendered to her family, the appellants, which was solemnly expressed by their disinheritance.     There does not seem to be any room for doubt as to the reality of the 'quarrel,' and the dislike to his grand-children consequent upon it—there was no 'insane delusion' as to that.     There had been a 'quarrel,' and since that time Mr. Baskin entertained and expressed a dislike to his grand-children.     Who was responsible for this quarrel?     Who was right and who was wrong?     Was it occasioned by delu-sion on the part of Mr. Baskin?     Did Mrs. Baskin give him offense, or did he imagine that he had been wronged?     Or did he offend Mrs. Sallie Baskin, under the spell of a morbid delusion?     These questions must remain unanswered, so far as the testimony is concerned.     There is no testimony showing, or tending to show, that the cause of the 'quarrel' was an 'insane delusion' on the part of Mr. Baskin.     And there has not been shown any want of capacity on the part of Thomas Baskin at the time of the execution of his will, by reason of any insane delusion.     It was incumbent on con-testants to show such want of capacity.     *Black* v. *Ellis,* 3 Hill, 68.     Interpreting the testimony of witnesses for con-testants in the light of the witnesses for the execution of the will, I could reach no other conclusion than that Thomas Baskin, the testator, was capable of executing that solemn instrument, and that he did so with a full knowledge of its contents, which embodied a previous rational purpose to dis-pose of his property as therein and thereby made.     But when the testimony of Dr. R. E. Dennis, W. K. Crosswell, L. M. Crosswell, Samuel Bradley and J. F. Woodward, witnesses for the will, each of whom had known Thomas Baskin for

thirty years, and the testimony of Jos. E. Wilson, who had known him for twenty-five years, that of L. L. Baker and other witnesses for respondent, is considered, any doubt which might have been entertained in relation to the mental capacity of Thomas Baskin disappears. From a careful consideration of the testimony and the law applicable thereto, I am convinced that the judge of probate was right in pronouncing in favor of the will in question, and that his ·decree should be affirmed accordingly. *Lee* v. *Lee,* 4 McCord Rep., 183.

"It is, therefore, ordered and adjudged, that the decree of the said judge of probate, pronouncing in favor of the will of Thomas Baskin, deceased, be, and hereby is, affirmed; and that the appeal herein be, and hereby is, dismissed."

To this decree the grand-children of the said Thomas Baskin, deceased, filed the following grounds of appeal:

"1. Because his Honor erred in not overruling the judge of probate in allowing the witness, W. K. Crosswell, over respondents' objection, to give his opinion as to the mental capacity of the said Thomas Baskin, without showing that he was an expert or requiring him to state facts upon which said opinion was based.

"2. Because his Honor erred in not overruling the judge of probate in allowing the witness, L. M. Crosswell, over respondents' objection, to give his opinion as to the mental capacity of the said Thomas Baskin, without showing that he was an expert or requiring him to state facts upon which said opinion was based.

"3. Because his Honor erred in not overruling the judge of probate in allowing the witness, Joseph E. Wilson, over respondents' objection, to give his opinion as to the mental capacity of the said Thomas Baskin, without showing that he was an expert or requiring him to state facts upon which said opinion was based.

"4. Because his Honor erred in not overruling the judge of probate in allowing the witness, J. F. Woodward, over respondents' objection, to give his opinion as to the mental

capacity of the said Thomas Baskin, without showing that he was an expert or requiring him to state the facts upon which said opinion was based.

"5. Because his Honor erred in not overruling the judge of probate in allowing the witnesses, W. K. Crosswell, L. M. Crosswell, Joseph E. Wilson and J. F. Woodward, over respondents' objection, to give their opinion as to the mental capacity of the said Thomas Baskin, without showing that they were experts or requiring them to state the specific facts upon which said opinions were based.

"6. Because his Honor erred in overruling the second exception to the decree of the judge of probate, which was as follows: 'Because his honor, the judge of probate, erred in holding that the said proposed will was valid, and that at the time of making the same the said Thomas Baskin was of sound and disposing mind, memory and understanding; whereas, it is respectfully submitted that the preponderance of the evidence showed that the said Thomas Baskin had been, and was at the time of the making of said will, of unsound mind, and that said will was the creation of the disorder with which his mind was affected.' In that the preponderance of the evidence showed that the said Thomas Baskin was at times of unsound mind, that the subject upon which he was of unsound mind was his family relations, and that his will, which disinherited his grand-children in favor of strangers, was the creation of the disorders with which his mind was affected.

"7. Because his Honor erred in not holding that the preponderance of the evidence was in favor of the contestants of said will in that, (a) Because the witnesses for proponent showed but ocasional and imperfect opportunities to observe the manifestations of Mr. Baskin's insanity, while the witnesses for contestants were his near neighbors and intimate acquaintances and a member of his immediate family. (b) Because the witnesses for the proponent testified only to the general condition of Mr. Baskin's mind (which was not attacked), and that without any statement of specific facts

from which the Court can draw its own conclusions, while the witnesses for the contestants testified as to the specific condition (the point in issue), and gave the facts upon which their opinions were based, and said facts fully sustain their conclusions of insanity.

"8. Because his Honor erred in holding, 'There is no testimony showing or tending to show that the cause of the "quarrel" was an "insane delusion" on the part of Mr. Baskin, and there has not been shown any want of capacity on the part of Thomas Baskin at the time of the execution of his will, by reason of any insane delusion.   It was incumbent on contestants to show such want of capacity.'   In that (a) The testimony showed that Mr. Baskin had two sets of grand-children, to wit: the children of Mrs. Sallie Baskin and of Mrs. DeLorme (folio 340) ; that there never had been any 'quarrel' with any except Mrs. Sallie Baskin and Ed. Baskin, and that had been amicably settled some time before the execution of the will, and that after the 'quarrel' he had spoken kindly of them except when in his 'spells.'   (b) The testimony showed that Mr. Baskin was of unsound mind at times before the execution of his will, and it was incumbent on the proponent to show a lucid interval at the time of the execution of the will.   (c) It was incumbent on proponent to show that the cause of the quarrel was founded in reason."

Although there are eight exceptions, yet, as the appellants well state in their argument, these present really three questions: "1. Can a non-expert witness state an opinion without stating the facts upon which it is based?   2. Does not the preponderance of evidence show that Mr. Baskin was of unsound mind at the time of the execution of the will?   3. Upon whom is the burden of proof that ill-feeling between a testator and his heirs is well founded and an insane delusion?"

1. Appellants are right in the law announced.   It is the facts that condemn this exception, for every witness examined spoke from practical knowledge of and acquaintance with the testator.   We do not know of any better

test than such knowledge which each witness possessed. "Over thirty years I knew him, saw him repeatedly, talked with the testator frequently." Some had business with him. Some visited at his house. The probate judge and the Circuit Judge committed no error here.

2. We have studied the whole testimony, and feel that the Circuit Judge was correct in holding that the evidence preponderated on the side of the full testamentary capacity of the testator on the 20th February, 1899, the date of the will.

3. It came out as *a fact* in the testimony on both sides that there was ill feeling between the testator and his grandchildren and his daughter-in-law. It was incumbent upon the contestants to show this ill feeling was groundless, so far as testator was concerned. We have not elaborated our views on these three points because we were so much pleased with Judge Dantzler's decree that at one time we thought of adopting it as the judgment of this Court. All the exceptions are overruled.

It is the judgment of this Court, that the judgment of the Circuit Court be affirmed.